[No. 2749-2.  Division Two.  June 7, 1978.]

THE STATE OF WASHINGTON, *Respondent,* v. GARY CHARLES EATON, *Appellant.*

*Cheryl R. Robbins* and *Manza, Moceri, Gustafson & Messina,* for appellant.

*Don Herron, Prosecuting Attorney,* and *Joseph D. Mladinov, Senior Deputy,* for respondent.

REED, J.—Defendant Gary Charles Eaton appeals his conviction of second-degree assault. RCW 9A.36.020(1)(b).

On June 24, 1976, Teamsters Local No. 313 in Tacoma went out on strike. Defendant, a union member, drove truck for Cammarano Brothers, Inc., one of the owner-distributors affected by the strike. The union established picket lines around the Cammarano plant. These lines were respected until June 29 when the employer decided to hire nonunion people to drive its trucks through the picket lines to a secret rendezvous point with a union driver from Seattle who would then assume control over the truck. The truck would be driven to Seattle for loading and then returned to the nonunion driver, who would drive it to Cammarano Brothers' plant. The first truck left the plant premises without incident.

The following day, June 30, as a Cammarano truck attempted to enter the plant, several picketing union drivers ganged together and blocked the plant's entrance gate. Later that day the union men tried unsuccessfully to prevent the departure of a truck.

The next morning, Mr. William Cammarano, in his car, and Mr. Wesley Buchanon, a nonunion member driving a company truck, drove from the plant; it was Mr. Cammarano's practice to accompany the truck to the point where the driver switch was to take place and drive the nonunion driver back to the plant to await return of the truck.

Defendant and numerous other union members, who had been notified to appear and receive their paychecks for the last prestrike period, arrived at the plant while Buchanon's truck was being loaded. Defendant Eaton and union members Greinke and Jonas discussed the matter, and it was agreed defendant would follow the two vehicles and attempt to separate Mr. Cammarano's car from the truck so that the strikers could speak with the nonunion driver privately. When Mr. Cammarano and Buchanon left the plant, defendant and others immediately took up pursuit. As the vehicles proceeded to the rendezvous point, defendant continually moved his automobile in and out between the Cammarano vehicle and the truck. Mr. Cammarano, however, was able to prevent isolation of the truck by positioning himself either in front of or behind the truck whenever defendant intruded between them. The vehicles continued in this hopscotch fashion for 3 or 4 miles until they reached King's Drive In, the intended rendezvous for the driver transfer. Defendant drove into the drive-in parking lot where he claims to have started a conversation with his brother-in-law who was then eating lunch. After a few moments, defendant noticed his fellow union members gathered around Mr. Cammarano's car and the beer truck, both of which had also pulled into the lot. His curiosity having been aroused, defendant drove to this end of the lot, stepped out of his vehicle and joined the crowd. At the center of the group a rather heated conversation was taking place between Mr. Cammarano and one of the striking union members. The latter was insisting that the nonunion driver's identity be revealed. Buchanon, who had remained in the truck's cab, suddenly climbed out and joined Mr.

Cammarano. Observing the crowd's mood was becoming ugly and fearing trouble, Mr. Cammarano instructed Buchanon to enter his car, at the same time taking his arm and turning him in that direction. The two men were able to move only a few feet, however, when violence erupted and Buchanon was grabbed by the crowd, whose members began to viciously attack him with their hands and feet. Mr. Cammarano's attempts to restrain the attackers were unsuccessful, but they began to disperse after he managed to cover Buchanon with his own body.

Buchanon was rushed by ambulance to the emergency room of St. Joseph Hospital where he was found to have suffered a fractured right cheek bone, fractured upper jaw, fractured nose, multiple bruises and contusions to the rib cage and right flank area. At the time of trial Buchanon was also suffering from impaired vision and symptoms indicating the possibility of brain damage. According to medical testimony, Buchanon's injuries were consistent with his having been punched and kicked repeatedly.

As a result of this incident five persons were charged with second–degree assault, RCW 9A.36.020(1)(b),[1] for having willfully inflicted grievous bodily harm on Buchanon and with reckless endangerment. RCW 9A.36.050. Ultimately, the charges against two of the defendants were dismissed, leaving only defendants Eaton, Jonas and Greinke.

Various accounts of the incident emerged at trial. Mr. Buchanon's testimony was hazy and vague in some respects, stemming from the fact that he had been attacked by several persons simultaneously; in his fear and excitement he had been unable to tell which assailants had delivered the various blows. He did recall, however, that defendants Eaton and Jonas had taken him by the arms and legs and carried him to the rear of the truck, at the same time striking him with their fists in the neck, head

---

[1] RCW 9A.36.020(1)(b) provides in part:

"Shall knowingly inflict grievous bodily harm upon another with or without a weapon . . ."

and chest area. He further testified the two dropped him to the ground near the rear of the truck where he was kicked several times in the head and upper torso by defendant Greinke and another man who he believed was defendant Eaton. Mr. Cammarano testified that when Buchanon was originally attacked, Greinke grabbed his arms from behind and Jonas began throwing punches to his head and upper body. He also observed Greinke strike Buchanon once in the face as he was being dragged to the rear of the truck. Mr. Cammarano admitted he did not see defendant carry the victim or strike any blows; he did not rule out the possibility that defendant had done so, however, emphasizing that his view was partially obstructed at times. After Buchanon was felled and lay on the ground, Cammarano saw Jonas and Greinke kicking him and observed defendant Eaton deliver at least one swift kick to the victim's upper body.

Defendant Eaton denied striking or kicking the victim, insisting he was merely a passive observer whose only contact with Buchanon came as he fended off the victim who had been pushed into him by the crowd. Greinke also denied assaulting Buchanon; he admitted, however, that he held the victim from behind while another man struck him in the face, causing him to reel backwards and fall face forward to the ground. Defendant Jonas admitted striking this last blow. One of the original defendants, D. Dressell, testified that the only blow he saw was from Jonas and that Buchanon hit his face on the truck's running board and the pavement when he fell. A directed verdict was granted on the reckless endangerment charge; defendant was convicted of assault and appeals.

Defendant first contends the trial court erred when it refused his proffered instructions on simple assault. RCW 9A.36.040.[2] We agree. Defendant was charged under RCW 9A.36.020(1)(b) with having inflicted "grievous bodily

---

[2]RCW 9A.36.040 provides:

"(1) Every person who shall commit an assault or an assault and battery not

harm" upon Buchanon. Conceding, as we must, that it is extremely unlikely that any reasonable person would not find that Buchanon's serious and debilitating injuries qualified as "grievous bodily harm," *State v. Linton,* 36 Wn.2d 67, 216 P.2d 761 (1950), that issue is necessarily one of fact for the jury. Defendant testified he did nothing more than push or fend off the victim after the mob had propelled him into defendant. Defendant denied either punching or kicking the victim. However unlikely his version may be, he was entitled to have it considered by the jury. In *State v. Davis,* 72 Wash. 261, 264, 130 P. 95 (1913), the court instructed the jury that the victim's injuries constituted grievous bodily harm as a matter of law. In reversing the conviction in that case the *Davis* court said:

> Since the subdivision of the statute under which the information is drawn makes the infliction of grievous bodily harm upon another an essential element of assault in the second degree, it is, of course, necessary to charge in the information that the injury inflicted was grievous bodily harm, and since the plea of not guilty puts in issue all of the material allegations of the information, it must follow that the question whether the particular injury inflicted amounts to grievous bodily harm is a question of fact for the jury to determine, rather than a question of law for the presiding judge. The court should therefore have defined the term grievous bodily harm to the jury, and left it to them to say whether the particular wounds inflicted upon the prosecuting witness came within the definition of the term.

In *State v. Ring,* 52 Wn.2d 423, 325 P.2d 730 (1958), our Supreme Court recognized the continued vitality of its *Davis* decision, noting that a contrary holding would offend a defendant's constitutional right to trial by jury. Const. art. 1, § 22 (amendment 10). In the instant case, as in *Davis* and *Ring,* it was necessary that the State prove beyond a reasonable doubt all of the elements of the crime charged,

---

amounting to assault in either the first, second, or third degree shall be guilty of simple assault.

"(2) Simple assault is a gross misdemeanor."

including the fact of grievous bodily harm. *Cf. In re Winship,* 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970). Whether these elements have been proved beyond reasonable doubt are questions of fact for the jury and may not be resolved as a matter of law by the court. The trial court's refusal to give defendant Eaton's proffered instructions on simple assault was tantamount to instructing the jury the State had satisfied its burden of proving beyond a reasonable doubt that Buchanon sustained "grievous bodily harm."

It is apparent from the record that, in determining that Eaton was guilty of second–degree assault or nothing at all, thus precluding an instruction on simple assault, the trial judge was influenced in great measure by the decisions in *State v. Stationak,* 73 Wn.2d 647, 440 P.2d 457 (1968) and *State v. Lewis,* 15 Wn. App. 172, 548 P.2d 587 (1976). These cases are inapposite, however, in that neither involved charges of second–degree assault under the "grievous bodily harm" subdivision of former RCW 9.11.020. Rather, each had to do with an assault alleged to have been committed with a weapon or other thing likely to produce bodily harm. We must say, in defense of the trial judge, that the deputy prosecutor who presented the State's case—not counsel on appeal—did little, if anything, to disabuse the judge of his notion that these cases were controlling on the facts of the instant case.

Even though the jury may have found Eaton guilty of second–degree assault for having aided and abetted the other defendants in inflicting "grievous bodily harm" upon Buchanon, that fact cannot be determined from the verdict. In addition, the other defendants also requested and were refused the same instructions on simple assault. We must assume, therefore, for the purposes of this opinion, that this refusal was also error. For the reasons we have given, the judgment and sentence must be reversed.

Because this matter must be remanded for a new trial, we will address certain other issues raised on appeal. Defendant asserts the trial court erred when it gave an

accomplice instruction based upon RCW 9A.08.020. The defendant argues there was no evidence that he knew of an intention on the part of other union members to assault Buchanon, or that he in any way encouraged them by word or deed. We disagree. The evidence we have outlined would clearly support a jury finding that the brutal beating of Buchanon was the result of concerted action by disgruntled union drivers. *State v. Olson,* 50 Wn.2d 640, 314 P.2d 465 (1957). Defendant does not deny that he followed Cammarano and Buchanon, driving his car according to plan in such a way as to isolate the victim for defendant's fellows. Also, Eaton voluntarily moved into the action which was taking place on the far side of the parking lot. Clearly, even if he struck no blow and delivered no kick, his earlier participation and his very presence could be said to have "encouraged" the others in their senseless attack on Buchanon. *In re Wilson,* 19 Wn. App. 104, 573 P.2d 1363 (1978). In our estimation, defendant's claim in this regard verges on the frivolous.

Defendant next argues that the trial judge's refusal to permit defense counsel to inquire as to the progress of jury deliberations, prior to the evening recess, was an abuse of discretion. After the jury had deliberated for some time its foreman requested clarification of an instruction, whereupon the jury was returned to open court. Because it was rather late in the evening, the trial judge inquired if there was a possibility of reaching a verdict that night; the foreman responded in the affirmative. When the jury had not arrived at a verdict by the hour predicted, the jurors were again brought to the courtroom where the foreman told the judge no verdict could be reached that night. At this point defense counsel requested the trial judge to ask the foreman if a verdict had been reached as to any individual defendant. This the trial judge declined to do. The jurors were then permitted to retire while arrangements were being made to lodge them until morning, at which time they were to continue their deliberations.

After trial it was learned that, prior to returning to the courtroom for further instructions, the jurors had already determined that Eaton was not guilty and the foreman had signed a verdict form to that effect. Thus, defendant argues that had the jurors been required to answer as to whether they had reached a verdict as to any defendant on either of the two occasions when they returned to the courtroom, they necessarily would have responded in the affirmative. It was only after returning for further deliberations in the morning and, after finding the other two defendants guilty, that the jurors apparently gave renewed consideration to the accomplice instruction and found defendant guilty, and changed the verdict form. Defendant contends that, once having found the defendant not guilty, the jury should have been made to disclose their verdict and that it was error to send them back for further deliberations. This contention is without merit.

CrR 6.16(a)(1) governs jury verdicts and reads, in part, as follows:

> If there are two or more defendants, the jury at any time during its deliberations *may* return a verdict or verdicts with respect to a defendant or defendants as to whom it has agreed . . .

(Italics ours.)

Clearly, the rule is couched in permissive rather than mandatory terms and envisions the exercise of sound discretion by the trial judge. Under the evidence defendant could have been found guilty either as a physical participant in the beating of Buchanon by holding, striking or kicking him, or as an aider and abettor of the others. In fact, as we have noted, a juror's affidavit filed in support of defendant's motion for new trial affirms the fact that it was only after the other defendants had been found guilty and the accomplice instruction had been reconsidered that the jury changed its mind regarding defendant's guilt. It is apparent, therefore, that forcing the jury to disgorge a premature verdict would have resulted in a gross miscarriage of justice. We find no abuse of discretion in refusing to

make the inquiry requested by defendants. Nor do we agree with defendant that CrR 6.16(a)(2)[3] renders the verdict invalid. This subdivision of the rule merely directs how a *final verdict* should be processed once the jury is ready to deliver and the court is ready to receive it. In Washington there is no verdict until it is finally rendered in open court, received by the judge and the jury discharged from further deliberations. *State v. Robinson,* 84 Wn.2d 42, 523 P.2d 1192 (1974); *State v. Badda,* 68 Wn.2d 50, 411 P.2d 411 (1966); *Bino v. Veenhuizen,* 141 Wash. 18, 250 P. 450, 49 A.L.R. 1297 (1926).

Reversed and remanded for further proceedings consistent herewith.

PEARSON, C.J., and SOULE, J., concur.

Reconsideration denied June 29, 1978.

Review denied by Supreme Court November 17, 1978.

---

[3]CrR 6.16(a)(2) provides: "When all members of the jury agree upon a verdict, the foreman shall complete and sign the verdict form and return it to the judge in open court."